# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 01-1522

———————

Minnesota Lawyers Mutual Insurance   *
Company and Subsidiaries,   *
  *
         Appellant,   *
  *   Appeal from the
    v.   *   United States Tax Court.
  *
Commissioner of Internal Revenue,   *   [TO BE PUBLISHED]
  *
         Appellee.   *

———————

Submitted:  October 15, 2001

Filed:  April 15, 2002

———————

Before MURPHY, BEAM and BYE, Circuit Judges.

———————

BYE, Circuit Judge.

      The various state insurance regulatory bodies require insurers to have adequate "unpaid loss" reserves on hand to make future payments on claims that have been filed, but have not yet been paid.  Insurance companies annually report the amount of their reserves to the state insurance regulators in an "annual statement" — a form prescribed by the National Association of Insurance Commissioners.  The tax code, 26 U.S.C. §§ 832(b)(5) & (c)(4), allows insurance companies to deduct "fair and reasonable estimate[s]," Treas. Reg. § 1.832-4(b), of their unpaid loss reserves when computing their income tax.

The Commissioner of Internal Revenue (Commissioner) determined that Minnesota Lawyers Mutual Insurance Company (MLM) overstated its unpaid loss estimates for the taxable years 1994 and 1995, and assessed MLM with tax deficiencies. MLM challenged the deficiencies in tax court. The tax court[1] found MLM's unpaid loss estimates were not fair and reasonable. Mn. Lawyers Mut. Ins. Co. v. Comm'r, 79 T.C.M. (CCH) 2234 (2000).

MLM contends the deductions claimed on its 1994 and 1995 tax returns should be presumed fair and reasonable because the estimates were selected by professional management and not tax-motivated; certified as reasonable by a qualified actuary; within a range of reasonable actuarial estimates; and reported in MLM's annual statement and accepted by the Minnesota Department of Commerce (MDC) without change. MLM invites us to adopt a test which conclusively establishes the fairness and reasonableness of unpaid loss estimates for tax purposes when the estimates meet these four criteria.

We decline MLM's invitation and affirm the tax court. The fairness and reasonableness of unpaid loss estimates is a factual issue determined by the tax court on a case-by-case basis. The four criteria outlined by MLM should be considered by the tax court in reaching its factual determination, but they are not conclusive. The tax court need not defer to estimates set forth in an annual statement and accepted by a state insurance regulator if the taxpayer cannot otherwise defend its estimates with detailed information related to its own experience.

I

MLM was formed in 1981, upon the recommendation of the Minnesota State Bar Association, to address the decreasing availability of affordable legal malpractice

---

[1]The Honorable Michael B. Thornton, United States Tax Court.

insurance caused by the volatility in that line of insurance in the late 1970s. With little previous insurance experience, MLM's executives had difficulty protecting MLM's original $1.5 million capital investment in its first three years of operation. Eventually, the MDC appointed a special examiner to supervise MLM. Among other things, the MDC ordered the company to improve its procedures for reviewing and assessing unpaid loss reserves.

In 1985, MLM began taking corrective measures to stabilize its financial situation. MLM established its own claims department rather than continuing to outsource claim management to a law firm. MLM also made several changes in its reserve policies. Notably, MLM doubled the minimum reserve for each individual claim from $7500 to $15,000, and established a new bulk reserve referred to as an "adverse loss development" (ALD) reserve. MLM also requested and received approval from the MDC for two premium increases to bolster the amount of its surplus.

The corrective measures worked. In 1986, the MDC conducted a special examination of MLM and concluded the causes of MLM's deteriorating surplus had been addressed and corrected. In a subsequent examination for the 5-year period ending December 31, 1993, the MDC declared MLM's unpaid loss reserves to be adequate.

In fact, MLM's corrective measures perhaps worked too well. Within the industry, MLM became recognized as regularly overstating its loss reserves. In 1994, A.M. Best, a company that rates the financial condition of property and casualty insurers, described MLM's pricing and reserving as "conservative by industry standards" and reported that "[MLM's b]ulk reserves on years prior to 1994 which were deemed redundant were reduced by $1.7 million last year. This take down of reserves has been a consistent pattern since 1987." Appellant's App. 438. Best's 1995 report on MLM stated "[fa]vorable underwriting gains continued for the tenth

consecutive year in 1995, despite a high frequency claim year. Underwriting income benefitted from the take down of approximately $3 million of redundant reserves from prior report years. This reduction has been a consistent pattern since 1987." Appellee's App. 20. The 1995 Best report further noted "significant accident year redundancies recorded over the last ten years [are] reflective of the very conservative reserving practices and commitment to reserve adequacy . . . [D]espite annual reductions on old report years, [MLM] continues to be very conservatively reserved." Id. at 21.

The Commissioner apparently took notice of MLM's conservative reserve policies as well. In 1994 and 1995, MLM claimed tax deductions for unpaid losses in the same amounts reported in its annual statements to the MDC. The annual statements included a statutorily required actuarial certification of the reasonableness of MLM's unpaid loss estimates, but MLM's actuary did not assist in determining the amounts MLM set forth in its annual statements or tax returns. Instead, the actuary was asked after-the-fact to review the amounts picked by MLM. In her report, the actuary set forth a range of reasonable estimates and concluded the amounts chosen by MLM fell within that range. MLM's annual statements were accepted by the MDC without change. Nevertheless, the Commissioner conducted an audit, concluded MLM was overstating its unpaid losses, and assessed MLM with tax deficiencies for 1994 and 1995 in the amounts of $436,295, and $380,570, respectively.

MLM filed a petition in tax court contesting the Commissioner's deficiencies. The case thereafter proceeded to trial. Both parties called expert witnesses to give actuarial opinions about the reasonableness of the unpaid loss estimates set forth in MLM's 1994 and 1995 annual statements and tax returns. Without recounting the details of the expert testimony, which are discussed by the tax court in its published decision, we focus on what we believe to be the dispositive factual aspect of this case — MLM's ALD reserve.

The ALD reserve was established by MLM to address the possibility that its individual case reserves might be understated. The ALD reserve was a "bulk" reserve rather than a reserve calculated case-by-case. The ALD reserve had two components, one for claims under $100,000, and one for claims in excess of $100,000.

For estimated claims under $100,000, the ALD reserve included a percentage of such claims. The percentage varied from year to year and reflected at least an element of judgment or subjectivity on MLM's part. MLM determined the amount of its ALD reserve by multiplying the amount of open claims for the most current year by 35% to 45% , and by multiplying the amount of open claims from prior years by smaller percentages for each prior year. MLM retained no documents showing how each year's percentages were chosen. Nor did MLM's records state what percentages applied in any given year. Instead, the percentages MLM applied for a given year were ascertainable only by "backing" into them (i.e., dividing the amount of the ALD reserve by the amount of case reserves shown on charts MLM presented in the tax court).

For estimated claims over $100,000, MLM made a separate and additional allowance in the ALD reserve. The amount of that allowance was not based on any percentage factor, but rather upon a subjective assessment of the number of such losses and how much each claim might cost.

MLM's ALD reserves for 1994 and 1995 were significant — $3,748,000, and $4,048,000, respectively — and when added to the individual case reserves, increased MLM's total unpaid loss reserves for 1994 and 1995 by approximately 37% to 50%.

The tax court found MLM failed to demonstrate either the necessity or reasonableness of the ALD reserves. As a factual matter, the tax court found that MLM did not establish the ALD reserve to hedge against historically inadequate reserves because MLM's recent experience had proven its case reserves to be

generous. The 1994 and 1995 Best reports indicated MLM was conservatively reserved and had written down excess reserves established in prior years since as early as 1987. Even MLM's own reserve analyses indicated significant redundancies in its case reserves.

The tax court further determined that MLM did not carry its burden of showing the ALD amounts were fair and reasonable — even assuming MLM could demonstrate the need for an ALD reserve. The tax court noted MLM did not show what specific factors, if any, were taken into account in establishing the extra reserve or how such factors might have been weighed. Indeed, MLM produced no documentation of any kind to show what data it analyzed in determining the amount of the ALD reserve. The tax court therefore held MLM failed to establish that its loss estimates represented a "fair and reasonable estimate of the amount the company will be required to pay," as Treas. Reg. § 1.832-4(b) requires. MLM timely appealed to this court.

II

MLM first challenges the tax court's interpretation of Treas. Reg. § 1.832-4, an issue of law we review de novo, Boeing Co. v. United States, 258 F.3d 958, 962 (9th Cir. 2001), deferring to the Commissioner's interpretation so long as it is reasonable. St. Jude Med., Inc. v. Comm'r of Internal Revenue, 34 F.3d 1394, 1400 (8th Cir. 1994).

The Treasury Regulation in issue provides as follows:

Losses incurred. Every insurance company to which this section applies must be prepared to establish to the satisfaction of the [Commissioner] that the part of the deduction for "losses incurred" which represents unpaid losses at the close of the taxable year comprises only actual unpaid losses. . . . These losses must be stated in amounts which, *based*

-6-

*upon the facts in each case and the company's experience* with similar cases, represent a fair and reasonable estimate of the amount the company will be required to pay. Amounts included in, or added to, the estimates of unpaid losses which, in the opinion of the [Commissioner], are in excess of a fair and reasonable estimate will be disallowed as a deduction. The [Commissioner] may require any insurance company to submit such *detailed information with respect to its actual experience* as is deemed necessary to establish the reasonableness of the deduction for "losses incurred."

Treas. Reg. § 1.832-4(b) (emphases added).

MLM argues the amount of unpaid losses set forth in an insurer's annual statement should be considered conclusively "fair and reasonable" under this regulation when the annual statement amount is selected by professional management and not tax-motivated; certified as reasonable by a qualified actuary; within a range of reasonable actuarial estimates; and accepted by a state regulator.

MLM relies principally upon Utah Med. Ins. Ass'n v. Comm'r, 76 T.C.M. (CCH) 1100 (1998). In Utah Med., the taxpayer's unpaid loss estimates were found by the tax court to be a fair and reasonable estimate under § 1.832-4(b). Two of the factors considered by the tax court in finding a fair and reasonable estimate were that (1) the taxpayer's estimate was within the range used by the taxpayer's actuary in its report to the state insurance regulator for approval of its annual statement, and (2) the taxpayer's estimate was accepted by the state insurance regulator without any adjustments. 76 T.C.M (CCH) at 1108-09. MLM argues both those facts are true here, and therefore require a finding that its unpaid loss estimates were fair and reasonable.

The tax court distinguished Utah Med. because, notwithstanding the fact that MLM's unpaid loss estimates fell within an actuary's range of reasonable estimates and were accepted by a state insurance regulator, MLM neglected to present "detailed

information with respect to its actual experience," Treas. Reg. § 1.832-4(b), to establish the reasonableness of its ALD reserve. In Utah Med. the taxpayer relied upon its actuary's report to prepare the annual statement and tax return. Here, MLM's actuary's reports were prepared *after* MLM had already determined the amount of unpaid loss reserves to report in its annual statements and tax returns. The tax court had to determine whether MLM's estimates were fair and reasonable "given the facts and circumstances at the time" they were made. Home Mut. Ins. Co. v. Comm'r of Internal Revenue, 639 F.2d 333, 340 n.16 (7th Cir. 1980). Since MLM arrived at its estimates without the benefit of an actuary's reports, the tax court did not err in discounting the actuarial opinions.

Furthermore, the tax court determined that the MDC's acceptance of MLM's unpaid loss estimate in its annual statement was a factor to be considered in evaluating the reasonableness of MLM's unpaid loss estimate, but was not a conclusive factor. We agree.

> The objectives of State regulation . . . are not identical to the objectives of Federal income taxation. State insurance regulators are concerned with the solvency of the insurer. . . . In contrast, Federal tax statutes are concerned with the determination of taxable income on an annual basis.

Sears, Roebuck & Co. v. Comm'r, 96 T.C. 61, 110 (1991), rev'd on other grounds, 972 F.2d 858 (7th Cir. 1992).

Our review of the cases interpreting § 1.832-4(b) support the tax court's determination that the fairness and reasonableness of a taxpayer's estimate is a factual issue to be determined on a case-by-case basis, and that no one factor should be considered conclusive. See Utah Med., 76 T.C.M. (CCH) at 1107 ("fair and reasonable estimate of a taxpayer's unpaid loss is essentially a valuation issue and a question of fact"); Hospital Corp. of Am. v. Comm'r, 74 T.C.M. (CCH) 1020, 1042 (1997) (holding that unpaid loss estimates "must be fair and reasonable based on the

facts in each case and the company's experience"; question is "essentially a valuation issue and a question of fact"; "taxpayer has the burden [of proof]"); Western Cas. & Sur. Co. v. Comm'r, 65 T.C. 897, 919 (1976) ("test of reasonableness should be directed at the total unpaid loss reserve since it is this amount that is taken into account in the computation of the 'losses incurred' deduction."). Thus, when an insurer fails to defend a portion of its estimates with detailed information related to its own experience, as occurred here, the tax court need not defer to the fact that the insured's estimates fell within an actuary's range of reasonable estimates and were accepted by a state insurance regulator.

III

MLM also challenges the tax court's application of the regulation. Our review of this question defers heavily to the tax court's unique discernment and expertise. "The determination of a fair and reasonable estimate of a taxpayer's unpaid losses is essentially a valuation issue and a question of fact. Thus, the scope of our inquiry is limited to deciding whether the Tax Court's determination on this issue was clearly erroneous." Hanover Ins. Co. v. Comm'r of Internal Revenue, 598 F.2d 1211, 1220 (1st Cir. 1979).

We cannot agree with MLM that the tax court erred in applying Treas. Reg. § 1.832-4. The tax court gave a detailed explanation of its factual finding that MLM's estimate was not "fair and reasonable." Primarily, as noted above, the tax court found MLM failed to adequately explain the ALD portion of its unpaid loss estimates. Since the ALD reserve comprised a significant portion of MLM's total unpaid loss estimates (37% in 1994 and 50% in 1995), we find nothing clearly erroneous about the tax court's factual findings.

To the extent MLM challenges the *validity* of Treas. Reg. § 1.832-4 on appeal, we agree with the Commissioner that MLM waived that challenge by failing to raise

it before the tax court.  <u>Vnuk v. Comm'r of Internal Revenue</u>, 621 F.2d 1318, 1321 (8th Cir. 1980).

IV

We affirm the decision of the tax court.

A true copy.

     Attest:

          CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.